114

# 568386

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN – SOUTHERN DIVISION

**JEFFREY J. LAFAVE, BARBARA J. LAFAVE**
**And ENTRUST NEW DIRECTION IRA, FBO,**

                  **Plaintiffs,**

vs.

**THE VINEYARD SOUTH, LLC, a California limited liability**
**company, WALTER W. LUCE, ROBERT O. MAYER, and**
**LTV BUILDERS/DEVELOPERS, INC., a California corporation,**

        **Defendants, jointly and severally.**

Case: 2:08-cv-10991
Judge: Cox, Sean F
Referral MJ: Scheer, Donald A
Filed: 03-07-2008 At 02:57 PM
CMP LAFAVE, ET AL V VINEYARD SOUTH
LLC, ET AL (EW)

R. BRADLEY LAMBERT (P34587)
R. Bradley Lambert PLC
Attorneys for Plaintiff
36330 Woodward Ave., Suite 300
Bloomfield Hills, MI 48034
(248) 642-7774

## COMPLAINT

**PLAINTIFFS JEFFREY J. LAFAVE, BARBARA J. LAFAVE, and ENTRUST NEW DIRECTION IRA, FBO**, by their attorneys **R. BRADLEY LAMBERT PLC**, state their Complaint against Defendants as follows:

### Jurisdictional Allegations
### (Incorporated in Each Count)

1.    Plaintiff Jeffrey J. LaFave is an individual who resides in the City of Bloomfield, Oakland County, Michigan.

2.    Plaintiff Barbara J. LaFave is an individual who resides in the City of Bloomfield, Oakland County, Michigan.

3.    Plaintiff Entrust New Direction IRA, FBO is an Individual Retirement Account of

which Jeffrey J. LaFave and Barbara J. LaFave are the principals.

4.      Defendant The Vineyard South, LLC ("Vineyard South") is a limited liability company organized under the laws of the State of California which has conducted marketing and other operations in Oakland County, Michigan, including but not limited to solicitation of a $200,000 investment from Plaintiffs.

5.      Defendant Walter W. Luce is an individual who resides in the State of California, and has purposefully conducted marketing and other operations in Oakland County, Michigan, including but not limited to solicitation of a $200,000 investment from Plaintiffs.

6.      Defendant Robert O. Mayer is an individual who resides in the State of California, and has purposefully conducted marketing and other operations in Oakland County, Michigan, including but not limited to solicitation of a $200,000 investment from Plaintiffs.

7.      Defendant LTV Builders/Developers, Inc. ("LTV B/D") is a corporation organized under the laws of the State of California which has conducted marketing and other operations in Oakland County, Michigan, including but not limited to solicitation of a $200,000 investment from Plaintiffs.

8       Plaintiffs' Complaint raises and pleads Federal questions and pendent state law claims.

9.      Many of the acts and transactions giving rise to the counts and complaints plead in this Complaint, including distribution of false and misleading information to Plaintiffs and the solicitation of Plaintiffs' investment based upon such false and misleading information, occurred in Oakland County, Michigan.  Plaintiffs signed the Subscription Agreement in Michigan, received multiple E-Mails, US postal mailings and other deliveries,  facsimile transmissions and phone calls through instruments of interstate commerce in Michigan, and conducted much of their due diligence

and business pertaining to the Complex and Vineyard South in and from Michigan.

### Common Allegations
### (Incorporated in Each Count)

10.     Defendants Walter W. Luce and Robert O. Mayer were promoters, founders, Members and Managers of Vineyard South. Defendant LTV D/B was and is a founding Member of Vineyard South.

11.     Defendants Luce, Mayer and LTV D/B have previously solicited and distributed real estate securities to Plaintiff Jeff LaFave.

12.     Defendant Vineyard South purchased approximately 61 acres of unimproved property in Coachella, California from a seller owned and controlled by Defendant Mayer.

13.     Defendant Vineyard South purchased the unimproved property with the intent of offering 10 "Membership Interests" in and to Vineyard South to unaffiliated persons who would invest $200,000 to acquire each individual Membership Interest in Vineyard South. The Membership Interests so offered are securities under applicable Federal and state securities laws, statutes and regulations. Defendants sought exemption from Federal and state securities laws in their offering of the Membership Interests to Plaintiffs and others.

14.     Through the efforts of Vineyard South's Managers and their affiliated entities, Defendants' stated plan was to cause Defendant Vineyard South to develop and construct a condominium and town home project (the "Complex") upon the purchased unimproved land.

15.     Defendants represented that the Complex would be developed in three phases under which 306 condominium units would be sold at Retail Prices ranging from $225,000 to $350,000 apiece, resulting in a "GRAND TOTAL" of $88,975,000 in gross sales. *See Exhibit 1*, Confidential Offering Memorandum dated December 15, 2004, page 6 and Villas at the Vineyards Price List.

16.     In their Confidential Offering Memorandum dated December 15, 2004, Defendants make the following written representations:

A.    The unimproved real estate purchased by Vineyard South had a value of "approximately $9,500,000."

B.    Defendant Vineyard South had obtained a loan in the amount of $12,000,000 to acquire the unimproved real estate.

C.    $1.3 million of the funds raised from investors such as Plaintiffs would be applied to purchase of the unimproved real estate. $275,000 of those funds would be applied to working capital and start up costs, and the remainder would be applied to other specified costs intended for and connected to development of the Project for the benefit of Vineyard South and its Members. *Source and Use of Funds* section, page12.

D.    At least one of the Managers is an owner of the Vineyards Country Club which has sold the Property to Vineyard South. *Conflicts of Interest* section, page 14.

E.    Vineyard South is managed by parties who are developers in the Coachella Valley and may but do not intend to develop properties which compete with the Project. *Conflicts of Interest* section, page 14.

F.    That property values were increasing significantly in neighboring Coachella Valley communities, thus reflecting the expected increased values for the real estate comprising the Complex. *Confidential Offering Memorandum, Exhibit 6.*

G.    The Complex amenities shall include a clubhouse of at least 3,500 square feet, six swimming pools, exercise rooms and meeting rooms.

H.    Condominium Unit owners receive a golf membership to the adjacent 9 hole golf course and the use of the clubhouse, workout facility, swimming pool, tennis courts and even future walking trails to be installed for their use. *Id.* p. 6.

I.    As Managers of Vineyard South, Defendants Luce and Mayer would deliver a proforma budget analysis for the Project on or before the date Investors make a final decision on purchasing their Membership Interests. The Managers are also thereafter required to prepare a Final Budget with greater detail prior to undertaking construction of the Complex.

17.     Defendants further represent in the Confidential Offering Memorandum that Investors such as Plaintiffs will receive a so-called "Preferred Equity Distribution" from sale of the

Condominiums. The Preferred Equity Distribution Agreement attached as Exhibit 3 to the Confidential Offering Memorandum states that Plaintiffs and other investors can and will receive $1,000 for each condominium or town house sold in the Complex.

18.     The "Investor Summary" in the Confidential Offering Memorandum limits the Preferred Equity Distributions to sales occurring in Complex Phases 2 and 3. Upon inquiry, Defendants affirmed the text of the signed Preferred Equity Distributions Agreement and represented that such distributions would be made to Plaintiff from all sales in all three Phases of the Complex.

19.     The Preferred Equity Distribution Agreement (a copy of which is contained in Exhibit 1) secures the payment obligation under that document by granting to Plaintiffs the security denoted in a "certain Fictitious Deed of Trust" that is represented to have been recorded against 58 separate parcels of real estate in California, with each parcel allegedly located in separate California counties.

20.     Defendants delivered the Confidential Offering Memorandum to Plaintiffs in Michigan in early 2005, prior to the date Plaintiffs invested in the Project and became members of Defendant Vineyard South, in accordance with applicable securities laws exemptions, and with the expectation that Plaintiffs would rely upon the information and representations made therein.

21.     Defendants contacted Plaintiffs in Michigan to make the myriad representations contained in the Confidential Offering Memorandum and the following oral representations soliciting Plaintiffs' investment in and to the Complex and Defendant Vineyard South:

    A.     The adjacent golf course and nearby "Motor Coach Casitas" were thriving developments that enhance the value of the Project. Defendants had sold or received commitments to sell 40-50 Casitas.

    B.     Property values in the surrounding Coachella Valley area were continuing to escalate at record levels.

    C.     Each of the Vineyard South Members would receive a Condominium Unit upon the completion of Phase 1, which would occur within several months of their investment.

D.  Plaintiffs would receive the $1,000 Preferred Equity Distributions from each sale of a Condominium Unit throughout the Complex.

E.  Defendants had many properties in California available to secure Plaintiffs' investment, including the 58 properties listed in the Preferred Equity Distribution Agreement. The equity in these properties would be available to recoup Plaintiff's investment in the event the Preferred Equity Distributions could not be made in sums sufficient to repay the Investors' investment in the Complex.

F.  Defendants had acquired options to purchase additional adjacent land, in part to facilitate construction of an additional nine holes for the golf course.

22.   Defendants maintained consistent contact with Plaintiffs through meetings and interstate telephone calls from California to Michigan in which they repeated their myriad misrepresentations in their ongoing effort to induce and solicit Plaintiffs' investment. Defendants used the Federal U. S. Postal service and interstate delivery services to convey the Confidential Offering Memorandum, Subscription Agreement, and other written documents and materials to and from Michigan and California.

23.   Defendants failed to disclose to Plaintiffs the following material facts concerning the Complex and Vineyard South:

A.  The unimproved property was sitting on a fault line which would cause significant development and regulatory issues and expenses Defendants did not take into account in their development cost estimates.

B.  The adjacent golf course was already declining in value due to its poor design and its failure to attract local golfers.

C.  Defendants had sold only one or two of the nearby "Motor Coach Casitas" and that part of the development was in fact in financial trouble from the start.

D.  The City of Coachella does not share the same attributes that attract investors and homeowners to purchase the condominium units to be built on the Complex as are found in the neighboring communities used by Defendants for purposes of representing comparative property values.

F.  The Coachella Valley market area promoted by Defendants as thriving was in fact

already declining.

E.    Defendants were already developing competing condominium projects near the Complex, including in Desert Hot Springs.

F.    Defendants had not prepared and had no intention of preparing either a proforma budget or detailed Final Budget detailing the costs of developing the Complex.

G.    Defendants did not record the promised Fictitious Deeds of Trust to many or all of the 58 California properties listed in the Preferred Equity Distribution Agreement presented as Exhibit 3 in the Confidential Offering Memorandum.

24.    At the time Plaintiffs made their investment, Defendants knew that the representations they made to Plaintiff prior to investing in the Complex and Vineyard South were false:

A.    The value of the unimproved real estate purchased by Vineyard South was not worth "approximately $9,500,000."

B.    Defendants received funds in excess of the represented value of the real estate acquired by Vineyard South from all sources, and retained or diverted those funds for their own unauthorized and illegal purposes.

C.    Defendants did not apply the funds as represented in the Source and Use of Funds Section of the Confidential Offering Memorandum.

D.    Defendants were already working on competing real estate developments within the market area of the Complex when they sold the Membership Interest to Plaintiffs, contrary to their representations that they had no such intentions.

F.    Property values were not rising and were in fact declining in the relevant real estate market in which the Complex was located.

G.    Defendants made no attempt to deliver the promised "Complex amenities," such as a clubhouse of at least 3,500 square feet, six swimming pools, exercise rooms and meeting rooms at any time after Plaintiffs acquired their Membership Interest, and had no intention of doing so from the start.

25.    Through their membership in Defendant Vineyard South, Defendants Mayer, Luce and LTV D/B would each benefit from the investment of Plaintiffs in and to Vineyard South, as such investment would enable Defendant Vineyard South to proceed with its development of the Complex, to the ultimate gain of Defendants Mayer, Luce and LTV D/B.

26.    In reliance upon the above-noted written and oral representations made by Defendants, including Defendants' repetition of those representations and material omissions through to and on the date Plaintiffs signed the Subscription Agreement, Plaintiffs paid $200,000 to purchase a Membership Interest in and to Defendant Vineyard South, pursuant to the Subscription Agreement dated March 7, 2005. Plaintiffs liquidated their IRA account to fund this investment. A copy of the Subscription Agreement signed and delivered by Defendants is attached as Exhibit "2." Plaintiffs signed the Subscription Agreement in Michigan.

27.    Development of the Complex did not proceed as represented by Defendants. Defendants developed many roads and other improvements within the Complex, and some Condominium Units, but not the represented number of Condominium Units.

28.    Defendants did not present the budgets, reports or other information to Plaintiffs concerning the Project as required by the Vineyard South Operating Agreement and applicable laws.

29.    After receiving only negligible information from Defendants during the first 16 months following Plaintiff's investment in Vineyard South, Plaintiffs contacted Defendants for an update on the Project. Defendants responded with an E-Mail indicating "we finally got the power connected which will now allow us to start closing units," which would in turn "begin the repayment process to the investors in increments of 10 closings @ $1,000 per unit."

30.    Plaintiffs had not been advised of the problems causing the delays and losses prior to the E-Mail exchange in August 2006. This was also the first time Plaintiffs were advised that repayments depended upon 10 closings at a time, or that the bank financing obtained by Defendants in the name of Vineyard South restricted and in many cases prohibited the repayments.

31.    In the ensuing months, Plaintiffs intermittently used instruments of interstate commerce to report problems with development of the Complex. The reported problems included

compliance with the many requirements imposed by the City of Coachella to obtain occupancy permits and correct threats associated with the ground conditions due to the presence of the fault line at the Complex. As late as February 2007, Defendants were still sending Plaintiffs and other Vineyard South Members E-Mails and making other contacts assuring them that the Complex development was still proceeding with a grand opening and other beneficial events, effectively misleading the E-Mail recipients as to the nature and the harm of their difficulties in proceeding with the development caused by the problems Defendants failed and refused to initially disclose when Plaintiffs made their purchase of the Vineyard South Membership Interests.

32.     Defendants continued to mislead Plaintiffs for several months thereafter as to the true nature and extent of their difficulties developing the Complex. Defendants even assured Plaintiffs they could select a Condominium Unit in the Complex that would be conveyed to them.

33.     Plaintiffs never received any Preferred Equity Distributions from Defendants nor conveyance of a Condominium Unit to the Complex. Defendants made no effort to convey the promised golf memberships in the adjacent course to Plaintiffs, despite their represented control over that facility. Plaintiffs have received no return on their Membership Interests whatsoever.

34.     Plaintiffs have not received any written financial reports, audits or Final Budget reporting on the financial state of affairs for Vineyard South or the Complex.

35.     Defendants have informed Plaintiffs that the financial institution providing the financing for the purchase and development of the Complex has foreclosed upon the Complex and Vineyard South's ownership of the Complex or any Units thereon. Defendants have never submitted any documentation or report in support of such reports and have refused Plaintiffs' requests for specific information.

36.     Defendants have not offered to remedy Plaintiffs' losses through sale or other

disposition of the 58 properties listed in the Preferred Equity Distribution Agreement. Public records reveal that Defendants did not record Fictitious Deeds of Trust on all of these properties as required under that Agreement.

37.     Defendants have for the past several months engaged in evasion and stalling tactics in response to Plaintiffs' repeated requests for recoupment of their investment in the failed enterprise.

38.     Defendants have not accounted to Plaintiffs for any of the money that was borrowed by Vineyard South, paid in by Plaintiffs and other investors to Vineyard South, or otherwise acquired by Vineyard South to purchase the Complex property from Defendants' affiliates, and develop the few Units that were constructed at the Complex.

39.     Since Plaintiffs have purchased their Membership Interest, Defendants have provided Plaintiffs no documents reporting on or providing material details related to their Membership Interest, Vineyard South, the transactions of Vineyard South, or other documents pertinent to Vineyard South or its operations.

40.     Plaintiffs have made repeated demands on Defendants to provide value for their investment in and to Vineyard South, but Defendants have failed and refused to produce any payout or value for same, or any accounting for the lost funds. Defendants have instead retained such funds for their personal benefit.

## COUNT I
## VIOLATION OF SECTION 10(b) of THE SECURITIES
## EXCHANGE ACT AND RULE 10(b)

41.     Defendants have singly and in concert, directly or indirectly, engaged in the common plan, scheme and course of conduct described in this Complaint to knowingly and recklessly engage in acts, transactions, practices and a course of business which defrauded Plaintiffs through the making of the false written and oral statements of material facts and omissions of material facts

described in the common allegations above, and employed manipulative or deceptive devices and methods in connection with the purchase and sale of the Vineyard South Membership Interests. Such false statements, repeated failures to disclose material facts, and deceptive devices include but are not limited to the following:

A. That the unimproved property purchased property was in a condition suitable for development as represented in Defendants' plans and specifications, when in fact the unimproved property was sitting on a fault line which would cause significant development and regulatory issues and expenses Defendants did not take into account in their development cost estimates.

B. The unimproved property was not worth $9,500,000 as represented by Defendants when they purchased that property from a company owned and controlled by some or all of the Defendants.

C. That the supposedly thriving adjacent golf course that Plaintiffs and Unit purchasers would be given a membership to was already declining in value due to its poor design and its failure to attract local golfers.

D. Defendants had sold only one or two of the nearby "Motor Coach Casitas," not the 40-50 represented by them, and that this part of the development was in financial trouble from the start.

E. Defendants did not apply the funds as represented in the Source and Use of Funds Section of the Confidential Offering Memorandum, and had no intention of so applying the funds in the manner stated.

F. Defendants did not record the promised Fictitious Deeds of Trust upon all of the 58 California properties listed in the Preferred Equity Distribution Agreement presented as Exhibit 3 in the Confidential Offering Memorandum.

G. The City of Coachella does not share the same attributes that attract investors and homeowners to purchase the condominium units to be built on the Complex as are found in the neighboring communities used by Defendants for purposes of representing property values.

H. The Coachella Valley real estate market area ballyhooed and promoted by Defendants as thriving was in fact already declining.

I. Defendants were already developing competing condominium projects near the Complex, including in Desert Hot Springs, in direct contradiction to Defendants' stated intent not to develop competing properties.

J.      Defendants had not prepared and had no intention of preparing either a proforma budget or detailed Final Budget detailing the costs of developing the Complex.

K.      Defendants did not deliver and had no intention of delivering golf course memberships "Complex amenities," such as a clubhouse of at least 3,500 square feet, six swimming pools, exercise rooms and meeting rooms when Plaintiffs purchased their Membership Interest, or at any time thereafter.

42.     The purpose and effect of Defendants' plan, scheme and course of conduct was to induce Plaintiffs to purchase the Vineyard South Membership Interests by overstating and inflating the value of the Vineyard South Membership Interests.

43.     Luce and Mayer, as promoters, Members and Managers of Vineyard South and the Complex, had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs. Defendants Luce and Mayer, or either of them, was or were acting on behalf of Defendants Vineyard South and LTV D/B when undertaking the actions described above.

44.     Defendants had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.

45.     Defendants made the material false statements, omitted material facts, and engaged in the artifices and deceptions with the scienter and intent to deceive Plaintiffs into purchasing the Vineyard South Membership Interest under false pretenses and with erroneous information concerning the true state of affairs and value of such purchase.

46.     Defendants' material false statements, omitted material facts, and artifices, devices

and deceptions were made in connection with Plaintiffs' purchase of the Vineyard South Membership Interest owned by them.

47.    Plaintiffs were unaware of the falsity of the material statements, omitted material facts, and Defendants' artifices, deceptive devices and fraudulent schemes employed by Defendants, and relied to their detriment upon the materially false statements, omissions and deceptive devices employed by Defendants when purchasing and holding the Vineyard South Membership Interest.

48.    Plaintiffs would not have purchased the Vineyard South Membership Interest had they known of the falsity of Defendant's representations, the omitted material facts concerning the Complex, and the deceptive devices employed by Defendants to induce their purchase.

49.    Defendants' deceptive practices, material misstatements, and omissions of material facts caused Plaintiffs to purchase and retain the Vineyard South Membership Interest.

50.    As a direct result of the wrongful acts alleged in this Complaint, Plaintiffs have suffered the loss of their $200,000 invested to purchase the Vineyard South Membership Interest, interest and other earnings available on the invested money, and other expenses and losses to be determined in the course of this proceeding, including at trial, and attorneys' fees awarded in the discretion of the Court thereby.

51.    By reason of their wrongful acts and Plaintiffs' reliance and losses caused thereby, Defendants have violated Section 10(b)(5) of the Securities and Exchange Act and Rule 10(b) promulgated under that statute, and are liable to Plaintiffs for their actual economic losses and other damages caused by such wrongful acts.

## COUNT II
## VIOLATION OF MICHIGAN UNIFORM SECURITIES ACT

52.    Defendants have singly and in concert, directly or indirectly, engaged in the common

plan, scheme and course of conduct described in this Complaint to knowingly and recklessly engage in acts, transactions, practices and a course of business which defrauded Plaintiffs through the making of the false written and oral statements of material facts and omissions of material facts described in the common allegations and Count I above, and employed manipulative or deceptive devices and methods in connection with the purchase and sale of the Vineyard South Membership Interests.

53.     The purpose and effect of Defendants' plan, scheme and course of conduct was to induce Plaintiffs to purchase the Vineyard South Membership Interests and overstate and inflate the value of the Vineyard South Membership Interests.

54.     Luce and Mayer, as promoters, Members and Managers of Vineyard South and the Complex, had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.  Defendants Luce and Mayer, or either of them, was or were acting on behalf of Defendants Vineyard South and LTV D/B when undertaking the actions described above.

55.     Defendants had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.

56.     Defendants made the material false statements, omitted material facts, and engaged in the artifices and deceptions with the scienter and intent to deceive Plaintiffs into purchasing the Vineyard South Membership Interest under false pretenses and with erroneous information concerning the true state of affairs and value of such purchase.

57.     Defendants' material false statements, omitted material facts, and artifices, devices and deceptions were made in connection with Plaintiffs' purchase of the Vineyard South Membership Interest owned by them.

58.     Plaintiffs were unaware of the falsity of the material statements, omitted material facts, and Defendants' artifices, deceptive devices and fraudulent schemes employed by Defendants, and relied to their detriment upon the materially false statements, omissions and deceptive devices employed by Defendants when purchasing and holding the Vineyard South Membership Interest.

59.     Plaintiffs would not have purchased the Vineyard South Membership Interest had they known of the falsity of Defendant's representations, the omitted material facts concerning the Complex, and the deceptive devices employed by Defendants to induce their purchase.

60.     Defendants' deceptive practices, material misstatements, and omissions of material facts caused Plaintiffs to purchase and retain the Vineyard South Membership Interest.

61.     As a direct result of the wrongful acts alleged in this Complaint, Plaintiffs have suffered the loss of their $200,000 invested to purchase the Vineyard South Membership Interest, interest and other earnings available on the invested money, and other expenses and losses to be determined in the course of this proceeding, including at trial.

62.     By reason of their wrongful acts and Plaintiffs' reliance and losses caused thereby, Defendants have violated the Michigan Uniform Securities Act and rules promulgated under that statute, and are liable to Plaintiffs for their actual economic losses and other damages caused by such wrongful acts, including statutory interest and attorneys' fees pursuant to the Michigan Uniform Securities Act.

**COUNT III**
## VIOLATION OF SECTION 17(a) of THE SECURITIES EXCHANGE ACT

63.     Defendants have singly and in concert, directly or indirectly, utilized means or instruments of interstate commerce to employ the devices, schemes and artifice described in the Common Allegations and in the previous counts above to:

A.     Defraud Plaintiffs in connection with the solicitation and sale of the Vineyard South Membership Interests to Plaintiffs;

B.     Obtain the $200,000 purchase price for the Vineyard South Membership Interests from Plaintiffs by inducing such transaction through the untrue statements of material fact and omissions to state material facts described above; and

C.     Engaging in the transaction and course of business described above to solicit and sell the Vineyard South Membership Interests in a manner that operates as a fraud upon Plaintiffs.

64.     Plaintiffs and each of them are purchasers under 15 USC §77q.  Defendants and each of them are sellers under 15 USC §77q.

65.     Defendants had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.

66.     Defendants made the material false statements, omitted material facts, and engaged in the artifices and deceptions with the scienter and intent to solicit and induce Plaintiffs to purchase the Vineyard South Membership Interest.

67.     Plaintiffs were unaware of the falsity of the material statements, omitted material facts, and Defendants' artifices, deceptive devices and fraudulent schemes employed by Defendants, and relied to their detriment upon the materially false statements, omissions and deceptive devices employed by Defendants when purchasing and holding the Vineyard South Membership Interest.

68.     Plaintiffs would not have purchased the Vineyard South Membership Interest had they known of the falsity of Defendant's representations, the omitted material facts concerning the Complex, and the deceptive devices employed by Defendants to induce their purchase.

69.     Defendants' deceptive practices, material misstatements, and omissions of material facts caused Plaintiffs to purchase and retain the Vineyard South Membership Interest.

70.     As a direct result of the wrongful acts alleged in this Complaint, Plaintiffs have suffered the loss of their $200,000 invested to purchase the Vineyard South Membership Interest, interest and other earnings available on the invested money, and other expenses and losses to be determined in the course of this proceeding, including at trial, and attorneys' fees awarded in the discretion of the Court thereby.

71.     By reason of their wrongful acts and Plaintiffs' reliance and losses caused thereby, Defendants have violated Section 17(a) of the Securities Exchange Act and rules promulgated under that statute, and are liable to Plaintiffs for their actual economic losses and other damages caused by such wrongful acts.

## COUNT IV
## COMMON LAW FRAUD

72.     Defendants made the material misrepresentations and omitted to disclose the material facts described above, including but not limited to the following:

A.      That the unimproved property purchased property was in a condition suitable for development as represented in Defendants' plans and specifications, when in fact the unimproved property was sitting on a fault line which would cause significant development and regulatory issues and expenses Defendants did not take into account in their development cost estimates.

B.      The unimproved property was not worth $9,500,000 as represented by Defendants when they purchased that property from a company owned and controlled by some or all of the Defendants.

C.     That the supposedly thriving adjacent golf course that Plaintiffs and Unit purchasers would be given a membership to was already declining in value due to its poor design and its failure to attract local golfers.

D.     Defendants had sold only one or two of the nearby "Motor Coach Casitas," not the 40-50 represented by them, and that this part of the development was in financial trouble from the start.

E.     Defendants did not apply the funds as represented in the Source and Use of Funds Section of the Confidential Offering Memorandum, and had no intention of so applying the funds in the manner stated.

F.     Defendants did not record the promised Fictitious Deeds of Trust upon all of the 58 California properties listed in the Preferred Equity Distribution Agreement presented as Exhibit 3 in the Confidential Offering Memorandum.

G.     The City of Coachella does not share the same attributes that attract investors and homeowners to purchase the condominium units to be built on the Complex as are found in the neighboring communities used by Defendants for purposes of representing property values.

H.     The Coachella Valley real estate market area ballyhooed and promoted by Defendants as thriving was in fact already declining.

I.     Defendants were already developing competing condominium projects near the Complex, including in Desert Hot Springs, in direct contradiction to Defendants' stated intent not to develop competing properties.

J.     Defendants had not prepared and had no intention of preparing either a proforma budget or detailed Final Budget detailing the costs of developing the Complex.

K.     Defendants did not deliver and had no intention of delivering golf course memberships "Complex amenities," such as a clubhouse of at least 3,500 square feet, six swimming pools, exercise rooms and meeting rooms when Plaintiffs purchased their Membership Interest, or at any time thereafter.

73.     The material misrepresentations of Defendants were untrue when made, and Defendants' omissions to state material facts were misleading to Plaintiffs. To the extent any such representations related to Defendants' performance, Defendants had no intention of performing any of the representations relating to future events, and made no effort from the start to do so.

74.     Defendants knew their myriad material misrepresentations were false when made, and

that their failures to disclose material facts were misleading when they made or omitted such statements, it he knew that it was false, or Defendants made such statements and omissions recklessly, without any knowledge of their truth and as a positive assertion.

75.     Defendants intended that Plaintiffs act upon their material misrepresentations and omissions of material fact.

76.     Plaintiffs acted in reliance upon Defendants' material misrepresentations and omissions of material fact.

77.     Plaintiffs suffered damages as a result of Defendants' material misrepresentations and omissions of material fact, including the loss of their entire investment of $200,000 in and to the Membership Interests, and all costs, interest and other losses associated with such investment and loss thereof.

## COUNT V
## SILENT FRAUD

78.     Defendants had knowledge of facts material to Plaintiffs' purchase of their Membership Interest in Vineyard South, but failed and refused to disclose such facts, despite having a legal duty to do so.  Such illegally concealed facts include but are not limited to:

A.     The unimproved property was sitting on a fault line which would cause significant development and regulatory issues and expenses Defendants did not account for in their development cost estimates to Plaintiffs and other investors.

B.     The unimproved property was not worth $9,500,000 as represented by Defendants when they purchased that property from a company owned and controlled by some or all of the Defendants.

C.     That the supposedly thriving adjacent golf course that Plaintiffs and Unit purchasers would be given a membership to was already declining in value due to its poor design and its failure to attract local golfers.

D.     Defendants had sold only one or two of the nearby "Motor Coach Casitas," not the 40-50 represented by them, and that this part of the development was in financial

trouble from the start.

E.  Defendants did not apply the funds as represented in the Source and Use of Funds Section of the Confidential Offering Memorandum, and had no intention of so applying the funds in the manner stated.

F.  Defendants did not record the promised Fictitious Deeds of Trust upon all of the 58 California properties listed in the Preferred Equity Distribution Agreement presented as Exhibit 3 in the Confidential Offering Memorandum.

G.  The City of Coachella does not share the same attributes that attract investors and homeowners to purchase the condominium units to be built on the Complex as are found in the neighboring communities used by Defendants for purposes of representing property values.

H.  The Coachella Valley real estate market area was in fact already declining.

I.  Defendants were already developing competing condominium projects near the Complex, including in Desert Hot Springs, in direct contradiction to Defendants' stated intent not to develop competing properties.

J.  Defendants had not prepared and had no intention of preparing either a proforma budget or detailed Final Budget detailing the costs of developing the Complex.

K.  Defendants had no intention of delivering or ability to deliver golf course memberships "Complex amenities," such as a clubhouse of at least 3,500 square feet, six swimming pools, exercise rooms and meeting rooms when Plaintiffs purchased their Membership Interest, or at any time thereafter.

79.  Plaintiffs continued to inquire about the above-listed conditions and aspects of the Complex and their proposed investment in Vineyard South throughout the offering period up to the point they purchased their Membership Interest.

80.  Defendants had a legal duty to disclose the material facts within their knowledge regarding the conditions attendant to development, and the financial and physical condition of the Complex.

81.  Defendants misled Plaintiffs by failing to disclose the myriad problems known to them concerning development of the Complex.

82.     Plaintiffs were misled as to the true marketing, physical, and financial condition of the Complex and detrimentally relied on Defendant's misrepresentations regarding these conditions pertinent to their prospective and ultimate investment in Vineyard South and the Complex.

83.     Plaintiffs have suffered damages in excess of $200,000 as a direct and proximate result of Defendants' nondisclosure of the material facts within their knowledge regarding the Complex and Vineyard South.

## COUNT VI
## INNOCENT MISREPRESENTATION
(Defendants Luce, Mayer and Vineyard South)

84.     Defendants have singly and in concert, directly or indirectly, made the many false misrepresentations of material facts, and omitted to state material facts, regarding the physical and financial condition of the Complex and Vineyard South to Plaintiffs as is stated in the Common Allegations and foregoing Counts of this Complaint.

85.     Defendants' false material misrepresentations and omissions to state material facts were made in connection with Plaintiffs' purchase of the Vineyard South Membership Interest from Defendants.

86.     Plaintiffs detrimentally relied on Defendants' misrepresentations regarding the Complex and Vineyard South.

87.     Plaintiffs have suffered damages in the amount of their initial investment, $200,000, plus all other losses and damages incurred as a result of such loss, as a direct and proximate result of Defendants' misrepresentations and failures to disclose material facts regarding the Complex and Vineyard South. Damages suffered by Plaintiffs have inured to the benefit of Defendants.

## COUNT VII
## VIOLATION OF CALIFORNIA CORPORATIONS CODE
(Defendants Luce, Mayer and Vineyard South)

88.    Defendants have singly and in concert, directly or indirectly, engaged in the common plan, scheme and course of conduct described in this Complaint to knowingly and recklessly engage in acts, transactions, practices and a course of business which defrauded Plaintiffs through the making of the false written and oral statements of material facts and omissions of material facts described in the common allegations and Counts above, and employed manipulative or deceptive devices and methods in connection with the purchase and sale of the Vineyard South Membership Interests.

89.    The purpose and effect of Defendants' plan, scheme and course of conduct was to induce Plaintiffs to purchase the Vineyard South Membership Interests and overstate and inflate the value of the Vineyard South Membership Interests.

90.    Luce and Mayer, as promoters, Members and Managers of Vineyard South and the Complex, had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.  Defendants Luce and Mayer, or either of them, was or were acting on behalf of Defendants Vineyard South and LTV D/B when undertaking the actions described above.

91.    Defendants had actual knowledge of the falsity of the material statements described in this Complaint, and of the material facts they omitted to disclose to Plaintiffs, or acted with reckless disregard for the truth by failing to ascertain and disclose the true facts in the statements made or omitted by them or other persons to Plaintiffs.

92.    Defendants made the material false statements, omitted material facts, and engaged in the artifices and deceptions with the scienter and intent to deceive Plaintiffs into purchasing the

Vineyard South Membership Interest under false pretenses and with erroneous information concerning the true state of affairs and value of such purchase.

93.     Defendants' material false statements, omitted material facts, and artifices, devices and deceptions were made in connection with Plaintiffs' purchase of the Vineyard South Membership Interest owned by them.

94.     Plaintiffs were unaware of the falsity of the material statements, omitted material facts, and Defendants' artifices, deceptive devices and fraudulent schemes employed by Defendants, and relied to their detriment upon the materially false statements, omissions and deceptive devices employed by Defendants when purchasing and holding the Vineyard South Membership Interest.

95.     Plaintiffs would not have purchased the Vineyard South Membership Interest had they known of the falsity of Defendant's representations, the omitted material facts concerning the Complex, and the deceptive devices employed by Defendants to induce their purchase.

96.     Defendants' deceptive practices, material misstatements, and omissions of material facts caused Plaintiffs to purchase and retain the Vineyard South Membership Interest.

97.     As a direct result of the wrongful acts alleged in this Complaint, Plaintiffs have suffered the loss of their $200,000 invested to purchase the Vineyard South Membership Interest, interest and other earnings available on the invested money, and other expenses and losses to be determined in the course of this proceeding, including at trial, and attorneys' fees awarded in the discretion of the Court thereby.

98.     By reason of their wrongful acts and Plaintiffs' reliance and losses caused thereby, Defendants have violated Sections 25401 and 25501 of the California Corporations Code and rules promulgated under that statute, and are liable to Plaintiffs for their actual economic losses and other damages caused by such wrongful acts.

## COUNT VIII
## <u>BREACH OF CONTRACT</u>
(Defendants Luce, Mayer and Vineyard South)

99.     By virtue of becoming Members of Vineyard South, Plaintiffs entered into a contractual relationship with Vineyard South, through the Operating Agreement, as the same might be amended, and other contractual documents pursuant to that Agreement.

100.     Under the Operating Agreement and other documentation, Defendants Luce, Mayer and Vineyard South were compelled to operate Vineyard South and perform specified duties with respect to that operation.

101.     Defendants Luce, Mayer and Vineyard South breached their contractual obligations owed to Plaintiffs in the following particulars:

A.     Failing to account for funds allegedly acquired for purchase of the Complex real estate which greatly exceed the stated purchase price of that property, and which funds were paid to an affiliate owned and controlled by Luce and Mayer.

B.     Failing to account for funds borrowed from financial institutions and acquired from Plaintiffs and other Members of Vineyard South with respect to development of the Complex.

C.     Engaging in deceptive practices with respect to the myriad failings and troubles developing the Complex as noted above, including to conceal those problems and delays from the Members.

D.     Failing to timely and properly proceed with development of the Complex. Defendants instead allowed Vineyard South to experience costly delays and excessive costs addressing the various regulatory and approval problems imposed by the City of Coachella.

E.     Failing to protect the interests of Vineyard South and Plaintiffs in the course of developing the Complex. In particular, Defendants have failed in their duty to adequately and promptly deal with acquisition of permits and approvals from the City of Coachella, and pursue any remedies for Vineyard South with respect to any delays or costs imposed on Vineyard South or the Complex due to the actions of the City of Coachella and its agencies, agents and departments.

102.     As a result of these breaches of their contractual duties, Defendants Luce, Mayer and

Vineyard South have caused Plaintiffs the loss of their initial investment in and to Vineyard South in the amount of $200,000, and all economic losses, damages and other costs yet to be fully accounted for due to the myriad contractual failures in developing the Complex.

## COUNT IX
## BREACH OF FIDUCIARY DUTY
### (Defendants Luce and Mayer)

103.   At all times after Plaintiffs became a Member in Vineyard South, Defendants Luce and Mayer were and acted as Managers of Vineyard South, and in that role and capacity owed fiduciary duties to Plaintiffs.

104.   Defendants Luce and Mayer acted in their own-self interest and in a manner harmful to the interests of Plaintiffs by engaging in the following acts and omissions:

A.   Failing to account for funds allegedly acquired for purchase of the Complex real estate which greatly exceed the stated purchase price of that property, and which funds were paid to an affiliate owned and controlled by Luce and Mayer.

B.   Failing to account for funds borrowed from financial institutions and acquired from Plaintiffs and other Members of Vineyard South with respect to development of the Complex.

C.   Diverting corporate opportunities belonging to Vineyard South by engaging in competing activities while Vineyard South and the Complex failed to maintain its business and suffered foreclosure.

D.   Engaging in deceptive practices with respect to the myriad failings and troubles developing the Complex as noted above, including to conceal those problems and delays from the Members.

E.   Failing to timely and properly proceed with development of the Complex. Defendants instead allowed Vineyard South to experience costly delays and excessive costs addressing the various regulatory and approval problems imposed by the City of Coachella, and failed to recoup those losses for the benefit of the Vineyard South Members.

F.   Omitting disclosure of the facts known to Defendants as described in paragraph 22 above, and failing to disclose the falsity of the many misrepresentations made by Vineyard South to Plaintiffs as described above.

105.    The conduct of Defendants Luce and Mayer breaches their fiduciary duties of good faith and fair dealing owed to Plaintiffs.

106.    As a result of Defendants' breaches of their fiduciary duties owed to Plaintiffs, Plaintiffs have suffered damages in the amount of the $200,000 investment made by them, and are entitled to payment of their attorneys' fees in relation to recovering such damages, as provided in the Vineyard South Operating Agreement, plus any other damages and losses suffered thereby.

### COUNT X
### ACCOUNTING
(Defendants Luce, Mayer and Vineyard South)

107.    After Plaintiffs purchased their Membership Interest in Vineyard South, Defendants failed to deliver any reports to Plaintiffs as required under the Vineyard South Operating Agreement. In particular, Defendants did not deliver a proforma budget or detailed Final Budget detailing the costs of developing the Complex, or any other written financial or management reports required by the Operating Agreement and applicable law.

108.    Defendants have failed to produce accurate and detailed records or information describing Vineyard South's activities since Plaintiffs purchased their Membership Interest in Vineyard South.

109.    Pursuant to the Vineyard South Operating Agreement, Defendants owe Plaintiffs the obligation to use skill and good judgment in managing Vintage South and to provide full and complete information concerning its activities to Plaintiffs and all other Members of Vineyard South.

110.    Plaintiffs cannot, even with liberal discovery, reasonably be expected to ascertain and determine the extent of business conducted by Vineyard South through Defendants or to reasonably ascertain the current accurate status of Vineyard South's assets and liabilities due to the number and

varied types of business activities, the multiple transactional nature of the Complex and units thereon, and the relationships between Vineyard South and those with whom it has dealt.

111.    Defendants should accordingly be required to provide Plaintiffs a full accounting of all activities of Vineyard South since March 7, 2005 at their sole expense, and such costs and expenses should not be charged or passed through to Plaintiffs or other Members of Vineyard South other than Defendants, since the Defendant Managers Luce and Mayer are solely responsible for the failure to provide a proper and accurate accounting.

**WHEREFORE,** Plaintiffs respectfully request that this Honorable Court grant Plaintiff a Judgment in the amount of $200,000, plus all losses and damages incurred by Plaintiffs as a result of their lost investment in Defendant Vineyard South, and all interest, plus actual attorneys' fees as allowed under the statutory or common law actions plead above, an accounting of Complex and Vineyard South receipts and profits, and all costs and other relief as is just and equitable, including statutory costs, interest and fees.

## PLAINTIFFS' DEMAND FOR A JURY TRIAL

Plaintiffs JEFFREY J. LAFAVE, BARBARA J. LAFAVE and ENTRUST NEW DIRECTION IRA, FBO, request a trial by jury.

Respectfully Submitted,

R. BRADLEY LAMBERT PLC

By: _____
R. Bradley Lambert (P34587)
Attorneys for Plaintiffs

**Dated: March 7, 2008**

# VILLAS AT THE VINEYARDS

# CONFIDENTIAL OFFERING MEMORANDUM

**Number** ____

**Dated December 15, 2004**

## CONFIDENTIAL OFFERING MEMORANDUM

### VILLAS AT THE VINEYARDS

**By VINEYARDS SOUTH L.L.C.**
A California Limited Liability Company

$2,000,000.00
10 Interests ($200,000.00 Each)

1

**EXHIBIT**

*1*

# SECTION 1
## INVESTMENT SUMMARY

VINEYARDS SOUTH, LLC., a California limited liability company (the "LLC""), was organized to purchase property located at the Vineyards Country Club located in Coachella, California approximately twenty (20) miles from Palm Springs, California (the AProperty@) and to develop a condominium resort complex consisting of three hundred six (306) units and to be known as the Villas at the Vineyards (the AComplex@).

The LLC offers the opportunity for the parties making capital contributions to the LLC (AInvestors@) to realize a payment on their capital contribution by the payment by the LLC in the amount of $200,000.00 to the Investor and the transfer of title free and clear to a condominium in Phase 2 or 3 of the Complex. In order to evidence the Preferred Equity Distribution and the payment of their return, the LLC shall issue a Preferred Equity Distribution Certificate, which shall be in the amount of $200,000.00 per Investor, and the Preferred Equity Distribution shall be paid in the increments of $1,000.00 upon the sale of each of the condominiums (not including those transferred to the Owners). (See the APreferred Equity Distribution@). The Preferred Equity Distribution Certificate shall contain a provision, which shall provide that the entire amount of the Preferred Equity Distribution shall be payable no later than thirty six (36) months from the date of the capital contribution by the Investor.

The Investors shall also receive a golf club membership at the Vineyards Country Club which will grant them preferential tee times and the use of the amenities of the Complex as described herein.

The Managers of the LLC are Walter Luce and Robert O. Mayer. The Managers are experienced real estate developers and have developed the Vineyards Country Club and many other projects in the Coachella Valley and elsewhere. (See the AManagers@).

The Investors will receive the return of $200,000.00 in the form of a Preferred Equity Distribution with a three-year payback feature. Additionally, the Investors shall receive a condominium valued initially at $250,000.00 free and clear of any encumbrance. (See Condominiums@).

2

## Terms of the Offering

**Number of Investors**

Ten (10) Interests shall be sold in the Preferred Equity Distribution plus a condominium. No person may purchase less than one (1) Interest, unless the Manager of the LLC, in its discretion determines.

**Price**

$200,000.00 per Interest upon subscription.

**Nature of Interests**

In exchange for a capital contribution to the LLC of $200,000.00 the investors shall receive the ownership of a Condominium Unit in Phase II or III which shall be located off of the golf course and shall receive a $200,000.00 Preferred Equity Distribution payable upon the terms hereof.

**Preferred Equity Position**

Preferred Equity Distribution in the amount of $200,000.00 subject to the construction and development financing of the Complex and which shall be evidenced by Preferred Equity Certificate.

**Use of Proceeds**

The proceeds will be utilized to purchase Property, legal fees, costs of the offering, and costs to construct the infrastructure, driveway, swimming pool, tennis courts the Complex, and Clubhouse

**Assessments**

Each Condominium shall be assessed an amount initially of approximately $200.00 per month for maintenance reserve utilities and taxes.

**Condominium Upgrade**

Each Investor shall have the right to upgrade the Condominium to be transferred and assigned to a Condominium Unit located on the golf course for the amount of $50,000.00 to be paid at the time of the original capital contribution and subscription.

3

# SECTION 2

# SUBSCRIPTION TO THE OFFERING

The Manager of the LLC reserves the right, in its discretion, to (a) accept all or any portion of a subscription from any investor, (b) reject any or all subscriptions received, (c) accept subscriptions for fewer than all five (5) Interests to be sold and (d) terminate this offering at any time. This Offering shall terminate on December 31, 2004 or, if extended by the Manager, on such later date as it shall determine (the "Termination Date"). The LLC shall hold all subscription funds in escrow and invest them in federally insured, interest-bearing accounts.

An investment in the LLC involves a high degree of risk of loss of the total investment. The Manager will not accept subscriptions for one Interest or more from persons whose net worth (jointly with her or his spouse or parents of any person twenty one (21) years of age or younger, if any) does not equal or exceed $1,000,000, inclusive of the investor's home, furnishings and automobiles or natural persons who had individual incomes less than $200,000 in each of the two (2) most recent years or $300,000 with spouse and who does not expect an income of less than $200,000 for the current year, or $300,000 with spouse.

Only accredited investors may invest, provided, however, the Manager may in its sole discretion determine if a potential investor may qualify as a party qualified to invest in this Offering. At the present time, only residents in the State of California are approved for participation in the Offering. However, residents of other states may be permitted to participate as investors upon approval of the Manager and appropriate legal registrations, if any, as may be required.

An investment in the LLC is suitable only for long-term investment by persons who have sufficient financial means to bear the risk of loss of their investment in the LLC and who have no need for liquidity with respect to their investment. The LLC has therefore adopted as a general investor suitability standard the requirement that all subscribers for interests represent in writing that: (a) they meet the net worth requirement set forth above; (b) they are acquiring the LLC for their own account, for investment and not with a view to resale or distribution; (c) they can bear the economic risk of losing their entire investment; (d) their overall commitment to investments which are not readily marketable is not disproportionate to their net worth and that their investment in the LLC will not cause such overall commitment to become excessive; (e) they have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investment in the LLC; and (f) they have substantial

4

experience in making investment decisions of this type or are relying on their own legal and/or financial advisors in making such investment decision.

Investors may subscribe by executing the Subscription Agreement, signature pages of the Power of Attorney and Subordination Agreement and delivering the signed subscription documents, Power of Attorney and Subordination Agreement, a check in the amount of the subscription to the Manager. The subscription documents for execution are in the accompanying Subscription Document Booklet. Copies of the Subscription Documents, Purchase Agreement, Preferred Equity Distribution Certificate, Subordination Agreement and Power of Attorney appear as Exhibits 1, 2, 3, 4 and 5 attached to this Memorandum.

Submission of the subscription documents will constitute an offer, irrevocable except as provided below, by the subscriber to be bound by their terms, but will not constitute a sale or issuance of the Interests unless and until such subscription is accepted by the Manager. Acceptance of a subscription will be evidenced by the Manager executing and mailing or delivering to the subscriber a counterpart of such investor's Subscription Agreement. Thereafter the Investor will receive an executed Preferred Equity Distribution Certificate in the amount of $200,000.00 and Assignment of Condominium Unit.

Subscriptions not accepted or rejected by the Termination Date may be withdrawn at any time thereafter prior to acceptance upon the request in writing of the subscriber. Unaccepted subscription funds, if any, will be returned to subscribers with interest, to the extent earned, net of any costs of investment.

**THE SUBSCRIPTION AGREEMENT CONTAINS A NUMBER OF IMPORTANT REPRESENTATIONS AND WARRANTIES BY THE SUBSCRIBER WITH REGARD TO, AMONG OTHER THINGS, HIS UNDERSTANDING OF THE OFFERING, HIS ABILITY TO BEAR THE ECONOMIC RISK OF THE INVESTMENT, HIS RESIDENCY AND HIS PURCHASE EXCLUSIVELY FOR HIS OWN ACCOUNT. EACH SUBSCRIBER AGREES TO INDEMNIFY THE LLC AND THE MANAGER WITH RESPECT TO LOSSES RESULTING FROM ANY MISREPRESENTATIONS OR BREACHES OF THE SUBSCRIPTION AGREEMENT BY SUCH SUBSCRIBER.**

# SECTION 3

## DESCRIPTION OF INVESTMENT

### THE PROPERTY

The LLC negotiated the purchase of the Property in 2004 and is prepared to close on the purchase of the Property in 2004.   The Property is sixty one (61) acres and is located adjacent to the Vineyards Country Club, which offers a 9-hole golf course.  The Property is located at the same exit for I-10 as the Trump 21 Casino. The Property is now valued at approximately Nine

Million Five Hundred Thousand and 00/100 Dollars ($9,500,000.00).

The Property is located in Coachella, California approximately 16 miles east of Palm Springs on Dillon Road, which has an exit from Interstate 10.   It is also located near Indio, La Quinta, Palm Desert and Indian Wells, which offer numerous golf courses, world class shopping, dining and entertainment.

### THE  COMPLEX

The Complex will be composed of three (3) phases of Three Hundred Six (306) condominiums, which shall vary in size from 1,350 square feet to 1,550 square feet with two (2) bedroom and three (3) bedroom units.  See the floor plan of the Condominium Units and a price list on Exhibit 5 attached hereto.

The Complex shall offer amenities, which shall include a clubhouse, of a minimum of 3,500 square feet, six swimming pools, exercise rooms and meeting rooms.   The owners of the Condominium Units shall also receive a golf membership to the 9 hole golf course at the Vineyards Country Club which will offer a par 36 nine (9) hole golf course and the use of the 5,200 square foot clubhouse, workout facility, swimming pool, tennis courts and in the future walking trails shall be installed for use of the Investors.

## MARKET

This project will be the first condominium and town home project to be situated in the City of Coachella. The demographic data of Coachella is attached hereto under Exhibit number 6 along with other market data as a group exhibits. Additionally, attached in the marketing package are similar condominiums and town homes in the Coachella Valley desert.

### Preferred Equity Distribution

Each Investor shall receive a Preferred Equity Distribution in the amount of $200,000.00 executed by the LLC. The Preferred Equity Distribution shall be recorded with the Recorder=s Office of Riverside County, California and shall be subject to all acquisition and development financing for the Complex. Investors shall execute a Power of Attorney in the form attached hereto as Exhibit 7, which shall grant the LLC the power to execute any and all subordination agreements to subordinate the Preferred Equity Distributions to the financing for acquisition and development of the Complex.

The terms of the Preferred Equity Distribution shall provide that the amount of $1,000.00 shall be payable to the holder of the Preferred Equity Distribution upon the closing of the sale of each of the first two hundred (200) Condominium Units to be sold. The Condominium Units to be transferred to the Investors hereunder shall be excluded from the security of the Preferred Equity Distribution, and the Investors shall waive any preferred interest in and to the ten (10) condominium units subject to the transfer under this Confidential Offering Memorandum. The amounts due under the Preferred Equity Distribution shall be payable no later than October 31, 2007.

7

## MANAGEMENT

Walter W. Luce and Robert O. Mayer shall manage the LLC.   Luce and Mayer have been involved in the development of in excess of $200,000,000.00 in residential development in the Coachella Valley and currently are involved in numerous residential, commercial and industrial projects in southern California.   They own and operate LTV Builders and Mayer-Luce Companies and maintain an office in Desert Hot Springs, California.  The biographies of Luce and Mayer follow hereafter.

**The Managers**

# WALTER W. LUCE

# PROFILE

My career in real estate development began in South Miami in the 1960's as a project manager with the Beck Companies located in Dallas, TX.  Under strict Southern Building Codes, I developed several hundred garden apartment units, condominiums, an eighteen hole golf course with over 1200 housing units (Crooked Creek Country Club, located on Kendall Drive in So. Miami) and several retirement communities.  My success at completing projects on schedule and on budget led the company to send me to Atlanta, GA. to complete the construction of a 600 unit hotel, now a Radisson property, also a 220 unit garden apartment complex along with 160 condominiums.  In addition to my construction duties, I was responsible for setting up models, staffing, marketing, sales and leasing for both the apartments and condominiums.

In the 1970's I was the District Manager in Tampa, FL. for the Redman Development Corp., headquarters in Dallas, TX.  My duties entailed:  reviewing and evaluating prospective development sites, directing the coordination and control of architectural, engineering and design services in the preparation of plans and specifications.  Further, I was responsible for preparing preliminary and detailed cost information, negotiating with subcontractors and suppliers, awarding of subcontract agreements, preparing detailed schedules of activity, coordinating draws, supervising project managers, and preparing reports/projections on 800+ units located in Clearwater, St. Pete, and Tampa, FL.

In the 1980's and 1990's, under Walter W. Luce and Associates, Inc. I was responsible for land acquisition, financing, development, model centers, marketing, sales, leasing and construction of several hundred rental, condominiums,

8

condo-conversion, weekly-rental units, commercial and residential properties priced from $150,000 to over $300,000 in Atlanta, GA. At the end of 1990 during the banking debacle I moved back to Vermont to await the recovery of the real estate industry.

While in Vermont I oversaw the reconstruction of a nine-hole golf course (Neshobe Golf Club) to eighteen holes completely rebuilding three holes and adding nine. Once that was complete I managed the clubs pro shop, restaurant and day to day operation during the transition to a new eighteen hole golf club. I completed my contract with the club and went to work for Bennington Rutland Opportunity Council (BROC) practicing my profession, real estate development.

While employed by BROC I was active in the real estate market, selling, packaging multifamily units, single family, commercial and assisted living communities on a small scale due to the demographics of Vermont. I resigned my position as Special Projects Planner for the Bennington-Rutland Opportunity Council, Inc., a nonprofit company located in Rutland, Vermont, on September 20, 1998 to establish a Real Estate Development Company in California. See our web site www.MayerLuce.com for additional information.

# WALTER W. LUCE

# PROFESSIONAL & CIVIC AFFILIATIONS

- Vermont Real Estate License acquired April 1996.

- Rutland Regional Planning Commission board member, 1997-98. Involved in local real estate and business planning.

- Member Rutland Work Investment Board 1997-98. Involved in helping low income people from welfare to work, 1997-98.

- Member Getting Ready to Work Board, working to prepare low income people for the work place once their benefits expire, 1997-98.

- Board Member of the newly established Boys and Girls Club of America – Rutland, 1997-98. Member Vermont Education Alliance, developing programs to accommodate future students needs as to education in the business world as it pertains to global economics.

9

- Brandon Vermont Chamber of Commerce, past member 1996.

- 2004 Business Person of the Year, Desert Hot Springs, CA.

# PERSONAL INFORMATION

I was honorably discharged from Army Finance.  I am a writer novelist.  My hobbies are running and golf.

10

# Robert Oscar Mayer
45854 East Via Villaggio
Indian Wells, CA 92210
rmayer@ltv-builders.com
760-288-4312

## Development Experience

- **1999 to Present** - Executive Vice- President and owner of LTV Builders / Developers Inc. as well as Managing Member of several LLC's developing various types of construction projects in Southern California. These developments include: Single Family Tract Homes, Multi- Family Condominiums, Apartment Complex's, Commercial Buildings, Office Industrial as well as High – End Country Club Communities. I specialize in land acquisition and the securing of entitlements and financing of these projects as well as the planning and management of these various properties. The properties sold, completed and under construction have a retail value in excess of $200,000,000.00.
- **1988 to 1996** - I owned and managed the construction of several high – end speculative homes in Indian Wells, CA. I also own and managed the redevelopment of a 40,000 s.f. historic loft warehouse building in Chicago, IL.

## Professional & Civic Affiliations

- **1996 to 1999** - Professional equity risk arbitrage trader specializing in NYSE and NASD underlying equities and options.
- **1986 to 1990** - Member, Seat Owner and Trader in Foreign Currency Futures Pits at The Chicago Mercantile Exchange in Chicago, IL.
- **1997 to 2000** - President of the Overlook Condominium Homeowners Association, Vail, CO.
- **1988 to Present** - Board Member and Director of the Oscar G. & Elsa S. Mayer Family Foundation.

## Personal Information

- **Education** - High School: Deerfield Academy, Deerfield, MA class of 1982. Undergraduate: Duke University, Durham, NC class of 1986.
- My Great - Grandfather was the founder of the Oscar Mayer Foods Corporation in 1883.
- Date of Birth: December 4, 1964.
- Hobby: Golf – I have been extensively involved in high level competitive amateur golf. Skiing
- References available upon request.

11

## SECTION 4

## SOURCE AND USE OF FUNDS

### Use of Proceeds

The LLC will use the funds for purchase of the Property, construction of the Complex, the marketing and promotional costs and costs of the offering.

### Specific Use of Funds

| | |
|---|---|
| Purchase of Property | $1,300,000.00 |
| Financing | 75,000.00 |
| Working Capital & Start Up Costs | 275,000.00 |
| Initial Marketing Costs | 100,000.00 |
| Equipment, Fixtures and Furnishings | 50,000.00 |
| Attorneys Fees | 50,000.00 |
| Professional Fees, Permit Fees and Architectural Drawing | 150,000.00 |
| TOTAL: | $2,000,000.00 |

The Manager has borrowed the amount of $12,000,000.00 for acquisition of the property and $13,000,000.00 for the development of Phase I of the Complex and is in the process of obtaining bids and job estimates and final approvals for construction. Therefore, the use of funds is estimated at this time. The Manager reasonably believes that the Complex can be completed with adequate working capital remaining for the LLC.

12

## SECTION 5

### Risk Factors

The interests offered hereby are highly speculative and present a high degree of risk of total loss of investment. Prospective investors should carefully consider the following factors relating to the investment before purchasing the Interests:

Ownership of Property.   The Property will be owned by the LLC subject to the mortgages and the Preferred Equity Distribution Units. In the event of the termination of existence of the Managers or the LLC, the completion of the Complex could be in jeopardy.

Preferred Equity Distribution Units   The Preferred Equity Distribution Units shall be recorded with the County of Riverside subordinate to all development and construction financing. It is possible that other governmental liens if ever filed could have priority over the Units. By virtue of the subordination of the Units, the Units have risk due to the secondary position.

Lack of Liquidity.  The investors should be fully aware of the long-term nature of their investment. There is no market for resale of the Preferred Equity Distribution Units, nor will one develop. In addition, the Interests may be transferred only subject to limitations imposed by federal and state securities laws. Accordingly, an investor may not be able to liquidate his investment, even in the event of an emergency.

Tax Liabilities.  While the LLC will attempt to make annual cash distributions to investors sufficient for an investor in the highest marginal federal income tax bracket to pay his federal and state tax liabilities with respect to the Interests for that year, there can be no assurance as to the certainty or amount of such distributions. It is therefore possible that an investor may have a negative annual cash flow with respect to his investment.

No Separate Representation of Investors by Attorney.  The investors in the offering have not been represented by independent counsel in the organization of the LLC or in the preparation of the Subordinate Trust Deed Units. Prospective investors should have their own legal and tax advisors review the Subscription Agreement, the Subordinate Trust Deed Units and this Confidential Offering Memorandum.

## **Conflicts of Interest**

1. The Manager is an owner of the Vineyards Country Club which has sold the Property to the LLC.

2. The LLC is managed by parties who are developers in the Coachella Valley and may but do not intend to develop properties which compete with the Complex

## **Federal Income Tax Aspects**

Each potential investor should obtain advice from his own tax advisor concerning the matters discussed in this Confidential Offering Memorandum and the effect of an investment in the LLC on his personal tax situation.

The equity interests have been established in order to provide the Investors with the investment in a capital asset, which will be eligible for capital gains income tax treatment.

## **Securities Laws**

The Interest has not been and will not be registered under the Federal Securities Act of 1933 or the California Securities laws. The Interests may not be sold or transferred by the investors in the absence of such registration or an exemption there from under Federal and State laws.

## **Further Information**

For further information, please contact Mayer/Luce at 760) 288-4312 or Mr. J. Brian Pierce at (312) 207-1410.

14

## EXHIBIT LIST

1.  Subscription Documents

2.  Purchase Agreement

3.  Preferred Equity Distribution Agreement

4.  Subordination Agreement

5.  Site Plan & Floor Plans

6.  Market

7.  Power of Attorney

# VINEYARDS SOUTH L.L.C.

# CONFIDENTIAL OFFERING MEMORANDUM

## EXHIBIT 1

### FORM OF SUBSCRIPTION DOCUMENTS

## SUBSCRIPTION AGREEMENT
## FOR VINEYARDS SOUTH L.L.C.

Minimum Subscription: 1 Interest at $200,000.00,

Maximum Subscription: None
(unless otherwise agreed to by the Manager)

The undersigned irrevocably subscribes for the purchase of that number of Interests which constitutes a loan to **VINEYARDS SOUTH L.L.C.**, a California limited liability company (the "LLC"), shown on page 4 of this Agreement. The purchase price of the Interests is payable upon the execution of this Subscription Agreement. The terms of this offering are outlined in the LLC'S Confidential Offering Memorandum dated October 15, 2004 ("the Memorandum").

The undersigned represents and warrants:

(a) If a natural person, that he or she is a resident of the State of Illinois is 21 years of age or over, and is a citizen of the United States of America; or

if an entity, that the undersigned individual signing this Subscription Agreement on its behalf is an authorized trustee, officer, or responsible party of such entity, and that the entity is domiciled in the State of Illinois.

(b) The Interests subscribed for herein are being acquired solely by and for the account of the undersigned as principal, for investment and not with a view to, or in connection with, the distribution or resale thereof,

(c) The undersigned has received and carefully read the Memorandum, and has had the opportunity to ask questions and obtain information necessary to make an investment decision. To the extent the undersigned has taken advantage of such opportunity, the undersigned has received satisfactory answers concerning the terms and conditions of the offering and the information in the Memorandum.

(d) The undersigned recognizes the speculative nature of the investment; is able to bear the economic risks of investment in the Interests and realizes that the undersigned's entire investment in the Interests may be lost; and the undersigned either has received professional guidance with respect to the undersigned's investment in the Interests or is experienced in investment and business matters.

(e) The undersigned's overall commitment to investments involving substantial is not disproportionate to the undersigned's net worth, and this investment will not cause such overall commitment to become excessive.

(f) The undersigned understands that no governmental authority has made any finding or determination relating to the fairness for public investment in the Interests and that no

governmental authority has recommended or endorsed or will recommend or endorse the Interests.

(g) The undersigned recognizes that there will be no market for the Interests and that the undersigned cannot expect to be able to readily to liquidate this investment.

(h) The undersigned has executed the Investor Suitability Questionnaire which accompanies this Subscription Agreement and the representations contained therein are true and correct.

(i) The undersigned acknowledges that if a Purchaser Representative (as defined in Regulation D) has been utilized by the undersigned (i) the undersigned and his Purchaser Representative have completed and executed the Purchaser Representative Acknowledgement and Questionnaire; and (ii) in evaluating the investment, the undersigned has been advised by such Representative as to the merits and risks of the investment and the suitability of the investment for the undersigned.

(j) The undersigned understands that the Interests are being offered pursuant to an exemption from State and Federal registration and cannot be resold by the undersigned without registration under the Securities Act of 1933 and applicable state securities laws or an exemption therefrom. The undersigned agrees not to resell or transfer the Interests being subscribed for unless the Interests are registered under such laws or are sold pursuant to an exemption therefrom. The undersigned understands that a legend will be placed upon any document that evidences the Interests stating that the securities have not been registered under the Securities Act of 1933 or the securities laws of any State and referring to the restrictions on their transferability and resale.

(k) The undersigned acknowledges that all documents pertaining to the transaction described in the Memorandum have been made available to the undersigned and the undersigned has had the opportunity to verify and clarify any information contained in the Memorandum.

(l) The undersigned has relied solely upon the Memorandum and independent investigations made by the undersigned and/or his advisors in making the decision to purchase the Interests subscribed for, and acknowledges that no other representations or agreements have been made to the undersigned with respect thereto.

(m) The undersigned understands that the purchase of Interests may be made only by "Accredited Investors." The undersigned is an "Accredited Investor" as that term is defined by Rule 501(a) of Regulation D promulgated under the Securities Act of 1933 as amended. If the undersigned no longer meets the requirements to be an Accredited Investor prior to admission to the LLC as a Member, the undersigned will immediately notify the LLC.

(n) The undersigned agrees that this Subscription Agreement is irrevocable and that the representations set forth in this Subscription Agreement shall become effective and binding upon the undersigned, and upon the undersigned's heirs, legal representatives, successors and assigns, upon the LLC's acceptance hereof.

The undersigned understands the meaning and legal consequences of the foregoing representations and warranties and hereby agrees to indemnify, defend and hold harmless the LLC and its partners, employees, agents, and their respective officers and directors from and against any and all loses, costs, damages, liabilities and expenses due to or arising out of a breach of any such representation or warranty. Such representations and warranties and this indemnifications shall survive the acceptance or rejection of this Subscription Agreement.

The undersigned hereby constitutes and appoints the Manager, with full power of substitution, the undersigned's true and lawful attorney, for him or her and in his or her name, place and stead and for his or her use and benefit to sign and acknowledge, file and record the Subordinated Trust Agreement and any and all mortgages, notes or financing instruments which shall be prior in interest to the Subordinated Trust Deed as provided in the Offering Memorandum and the Subordinated Trust Deed. The undersigned hereby ratifies and affirms the provisions of the Offering Memorandum and the Subordinated Trust Deed.

Subscription proceeds shall be held in an escrow account established with such financial institution as the LLC, in its sole discretion, shall determine until the subscription of the investor/lender is accepted by the Manager of the LLC. If by December 31, 2004, which date may be extended by the LLC without notice to February 1, 2005, the LLC has not received subscriptions for Interests totaling $1,000,000.00, this Subscription Agreement shall automatically terminate, the undersigned shall be released from all obligations hereunder, and all funds paid hereunder shall be promptly returned to the undersigned with interest earned thereon, as determined by the LLC on an equitable basis.

This Subscription Agreement may be accepted by the LLC by executing and mailing to the undersigned a copy hereof. In the sole discretion of the LLC, this subscription may be rejected or reduced in amount (in which case any excess monies will be returned to the subscriber).

Number of Interests Subscribed:    _____

Amount of Subscription:    _____

{EXECUTION PAGE}

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement for **VINEYARDS SOUTH L.L.C.**, on the date listed below:

Date:_____

_____
Print Name of Investor

_____
Joint Owner (if any)

_____
Signature/title if applicable

_____
Signature/title if applicable

_____
SSN or Taxpayer I.D. Number

_____
SSN or Taxpayer I.D. Number

_____
Home Address

_____
Mailing Address (if different from above)

Phone Number: _____     _____
                       Home                                Work

Email Address:_____

## ACCEPTANCE BY MANAGER

This Subscription Agreement is accepted for _____ Interests in the amount of $_____, this _____ day of_____, 2004.

VINEYARDS SOUTH, L.L.C.
a California limited liability company

_____
WALTER W. LUCE, MANAGER

_____
ROBERT O. MAYER

## INDIVIDUAL ACKNOWLEDGEMENT

State of _____     )
                               ) SS.
County of _____      )

On this, the _____ day of _____, 2004, before me, a Notary Public, personally appeared _____, known to me (or satisfactorily proven) to be the person(s) whose name(s) is (are) subscribed to the foregoing Subscription Agreement, and, after first being duly sworn, acknowledged that he (she) (they) executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public

My commission expires:_____

## PARTNERSHIP ACKNOWLEDGMENT

STATE OF _____     )
                           ) SS
COUNTY OF _____      )

I, the undersigned, a Notary Public in and for said County, in the State of aforesaid, DO HEREBY CERTIFY that _____, a Partner of _____, a _____ Partnership, and personally known to me to be the same person whose name is subscribed to the

foregoing instrument, appeared before me this date in person and acknowledged that the statements set forth in the foregoing instrument are true and correct, and that being authorized and directed to do so he did sign the foregoing instrument as the free voluntary act of said Partnership, and as his free and voluntary act and deed personally as such partner, for the uses and the purposes therein set forth.

Subscribed and sworn to before me this _____ day of _____, 2004.

_____
Notary Public

My commission Expires:_____

## CORPORATE ACKNOWLEDGMENT

STATE OF _____ )
                       ) SS
COUNTY OF _____ )

I, the undersigned, a Notary Public in and for said County, in the State of aforesaid, DO HEREBY CERTIFY that _____, personally known to me to be the _____ of _____, a _____ corporation, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that the statements set forth in the foregoing instrument are true and correct, and that as such _____, he signed and delivered the said instrument, and caused the corporate seal of said corporation to be affixed thereto, pursuant to authority given by